UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 4:04CR00538 JCH (AGF) |
| | ) | |
| LORENZO BROOKS, | ) | |
| | ) | |
| Defendant. | ) | |

**REPORT AND RECOMMENDATION**
**OF UNITED STATES MAGISTRATE JUDGE**

This matter is before the Court on the motion to suppress of Defendant Lorenzo

Brooks. Pretrial matters were referred to the undersigned United States Magistrate Judge

under 28 U.S.C. § 636(b). Defendant Brown filed a motion to suppress a shotgun seized

from the backyard of his residence. Although Defendant denies that he made any oral

statements to the police, he also moved to suppress any statements the government alleges

he made, as the fruits of the unlawful search. (Doc. Nos. 19 & 20).

An evidentiary hearing was held on January 19 and completed on January 25,

2005. The government was represented by Assistant United States Attorneys Christian

Stevens and Patrick Judge. Defendant Brown was present and represented by his

attorney, Richard Fredman. Following the hearing, the parties were granted leave to file

post-hearing memoranda, after which the matter was taken under submission.

At the evidentiary hearing, the government presented the testimony of Steve

Schwerb, a police officer employed with the St. Louis Metropolitan Police Department

(SLMPD). Defendant Brooks presented the testimony of his stepfather, Joseph Leroy

Gholston; his mother, Catherine Gholston; and a friend, Odedeh Hathor, who testified

that she was present with Defendant at the time of the incident.  Defendant also testified

in his own behalf.  Based on the testimony and evidence adduced and having had an

opportunity to observe the demeanor and evaluate the credibility of the witnesses, the

undersigned makes the following findings of fact and conclusions of law.

## FINDINGS OF FACT

On July 11, 2003, Officers Schwerb, Keithley, and Sloan and Sergeant Marks were

on duty, working as part of the 8th District Weed & Seed unit.  At approximately 3:00

p.m., while they were on patrol, Officer Schwerb received information from a

confidential informant (CI), who had proven reliable in the past.  The CI had motioned to

Officer Schwerb, and he met the CI in an alley and spoke to him/her face-to-face.  The CI

stated that an individual named Lorenzo Brooks was selling heroin and guns from his

basement apartment at 3909 Lexington (the "Residence"), in the City of St. Louis.  The

CI said that Lorenzo Brooks lived in the basement apartment, and that there was an

exterior door to the apartment in back.  The CI stated that customers would knock on the

back door to get Brooks' attention, and Brooks would take their money, go into the

basement, and return with the firearms or drugs.  The CI did not indicate whether he/she

had ever been in the basement apartment and did not indicate when the last transaction

he/she knew of had occurred.

At approximately 4:00 p.m., about one hour after receiving the information, the

four officers drove to 3909 Lexington to investigate further.  They had not followed up on

the information immediately because at the time they were engaged in another

investigation. The officers were wearing T-shirts with "Police" printed on them and badges around their necks, and they were easily identifiable as police officers.

The Residence is a two-family apartment building, which the Court will describe in some detail, as it is relevant to the suppression issues. At the front of the building there are two doors, which lead to the first-floor and upstairs apartments. Gov't. Exs. A & O. Other tenants resided in those apartments at the time of these events. There are two windows at ground level at the front of the Residence, which are windows to the basement apartment.

A public sidewalk runs across the front yard of the Residence. On the right side of the front yard are some steps and a walkway that runs from the sidewalk to the front of the Residence, and then continues straight ahead, along the side of the building, in the gangway between 3909 Lexington and 3907 Lexington. Def. Ex. 7. A short stretch of chain-link fence, which has a gate, runs between 3909 and 3907 Lexington, across the gangway. Def. Exs. 1 & 7; Gov't. Exs. B & G. In the gangway between the Residence and 3907 Lexington there are two air conditioning units for the Residence, and just past the air conditioners there is a side door to the Residence. Gov't. Ex. G. The side door leads to a landing, from which there are steps leading to the doors of the first and second floor apartments, as well as steps leading down to the basement.

A chain-link fence surrounds the backyard of the Residence. Def. Exs. 4-6. A small piece of fencing closes off the yard of 3907 Lexington from the area. Def. Exs. 3, 4 & 8. Because of the small piece of fence that connects to 3907 Lexington, one cannot access the gangway from the backyard of 3907 Lexington. As such, there are three ways

to access the gangway between the two buildings: through the front gate, from the backyard of the Residence, and from the side door of the Residence.

The path through the gangway leads directly to the backyard of the Residence. There is a door from the basement to the backyard. Def. Ex. 3. Turning the corner at the back of the Residence, there are approximately eight steps that run parallel to the back of the building and lead down to the basement door. See Gov't. Ex. R; Def. Ex. 9. Entering the basement from the back door, there is a washroom that is used by all of the residents, and then another door to Defendant's one-room apartment. There is a small two-story addition at the back of the Residence. A door in the addition gives the first and second floor tenants direct access to the backyard. Gov't. Exs. D, E & J.

Directly behind the backyard is a public alley that runs behind the apartment buildings on Lexington. Gov't. Exs. K-M; Deft. Ex. 6. The alley opens to Vandeventor and Beaumont High School on one end and to Bishop Place on the other. Gov't. Exs. I & M. Dumpsters are disbursed throughout the alley for the use of the residents on Lexington, including those at 3909 Lexington. Gov't. Ex. K. There is a gate in the fence that surrounds the backyard, which opens to the alley. Deft. Ex. 6. The backyard of the Residence is plainly visible from the alley and from the backyards of the surrounding buildings.

The officers initially drove up the back alley to see if there was in fact a rear basement door, to examine the layout, and to determine if they could find a surveillance position. From the alley, however, they were unable to see the basement door, because it is recessed and partially covered by the back addition. The officers drove to the front of

the building and parked.  Officers Sloan and Sgt. Marks went to the front of the

Residence, while Officers Schwerb and Keithly headed toward the back.

When the officers arrived, the front gate to the gangway was open, and there was

nothing to prevent persons from walking through.  There were no locks on the gate, no

locks hanging from the gates, and no signs indicating that it was private property or that

persons should keep out.  The officers walked up the steps from the sidewalk, through the

gate, and along the gangway between the two buildings toward the back.  As they reached

the back of the Residence, the officers saw a black male standing in the rear yard near the

back door.  The subject peeked his head around the corner, and after seeing the officers,

fled through the backyard and into the alley, heading west.  At the time, the gate in the

backyard leading to the alley was open.  As this was happening, a man, later identified as

Defendant Lorenzo Brooks, was heading up the basement steps, near the top step.  He

was carrying a long item wrapped in trash bags.  Although he could not see the item

because of its wrapping, Officer Schwerb, who was familiar with firearms, believed the

item to be a rifle from its shape.

Defendant Brooks made eye contact with Officer Schwerb, and then turned and

ran down the steps to the basement.  As he ran down the steps, Defendant threw the item

he had been carrying to the right, into the crawl space or open area under the back

addition.  He then ran into the basement, and Officer Schwerb followed after him.  As he

was descending the basement steps, Office Schwerb looked into the crawl space and was

able to see the item Defendant had discarded, which had landed about three feet from the

stairs.  He saw what he recognized as the stock of a rifle or shotgun protruding from the

trash bag.  Officer Schwerb chased after Defendant into the basement and apprehended

him immediately.  He placed Defendant in handcuffs and conducted a pat-down.

Officer Keithly retrieved the item from the crawl space.  It was a 20-gauge

shotgun, loaded with one round.  Officer Keithly removed the ammunition and advised

Officer Schwerb what he had found.

Officer Schwerb advised Defendant that he was under arrest for carrying a

concealed weapon.  He read Defendant his Miranda rights from a card that he keeps with

him.  Defendant, who at the time was 45 years old, said he understood his rights.  He did

not appear to be under the influence of any drugs or alcohol and seemed to understand

what was being said to him.  The officers did not question Defendant at the time, but

Defendant made some statements regarding the shotgun that were not identified at the

hearing.  The officers canvassed the area for the subject who had fled into the alley, but

were unable to locate him.  Sgt. Marks took some photographs of the area that day,

although the exact timing when this occurred is not clear.[1]  Government Ex. B shows the

front gate to the gangway between the Residence and 3907 Lexington.  Officer Schwerb

testified that they closed the gate to take the photograph.

The officers brought Defendant to the station.  They performed a record check and

determined that Defendant had multiple prior felony convictions.  They advised

Defendant he was under arrest for being a felon in possession of a firearm and re-advised

---

[1]  Government Exhibits A, B, N, O, P, Q, and R were taken at the time of the
incident.  The remaining photographs, which show snow on the ground, were taken either
by Defendant's investigator or the government approximately one week prior to the
hearing.

Defendant of his rights. Apart from responding to routine booking questions, Defendant did not make any further statements. During their encounter with Defendant, the officers did not make any promises or threats to Defendant.

Defendant's stepfather, Joseph Gholston testified that he had owned the Residence since 1969. He is 70 years old and retired. He lived at the Residence for approximately 27-28 years with his wife, Catherine Gholston, who is Defendant's mother. Mr. Gholston had raised Defendant since Defendant was about six years old. Approximately 10 years ago Mr. and Mrs. Gholston moved to a different home on Hawksberry, in Ferguson.

Mr. Gholston was able to provide historical information regarding the Residence. He testified that the gangway between the two properties is not shared; both the gangway area and the two air conditioning units in the gangway are his property. Mr. Gholston installed the fence around the property approximately 13-14 years ago, for protection. He explained that a lot of "undesirables" lived around there, and some items he had kept in a shed[2] in the backyard had been stolen. He also had had some problems with persons disturbing the air conditioning units. While he lived there, Mr. Gholston kept a padlock on the front gate, and a chain with a lock on the back gate, both of which could be opened with a key. He would give a copy of the key to the tenants, with instructions to keep the gates locked.

After the Gholstons moved, Defendant Brooks was allowed to live in the basement apartment. Defendant functioned as an on-site manager for his stepfather and was

---

[2] The shed had been torn down by the date of the arrest herein.

responsible to collect rent, let repair people in, and help find tenants when an apartment was vacated. It was Defendant's responsibility, not Mr. Gholston's, to make sure the gates were locked. Mr. Gholston would not go to the property unless Defendant called him. He estimated that he might visit the property about once per month.

Mr. and Mrs. Gholston learned of Defendant's arrest when a tenant phoned Mrs. Gholston. The following day Mr. and Mrs. Gholston went to the apartment to check the premises. When they arrived the front gate was locked. Mr. Gholston did not know whether it had been locked the day before, when the arrest occurred. Mr. and Mrs. Gholston were never asked to provide consent to search or enter the premises, and they did not give the officers consent to enter the premises on July 11, 2003.

Odedeh Hathor testified that she was a friend of Defendant's who used to live across the street, although it was unclear whether she still lived across the street at the time of this incident or had already moved elsewhere. She testified that on July 11, 2003, she came to visit Defendant at the Residence at about 9:00 or 10:00 a.m., entering either through either the back or side door. She said the front gate leading to the gangway was locked, and that Defendant had come out and unlocked it for her. She testified that she and Defendant Brooks were there all day, in Defendant's bedroom. She said that while in bed with Defendant, she heard some bumping around upstairs and then heard people at the interior door that leads from upstairs. She went to the door, naked, and the persons at the door said they were the police and told her to open the door or they would bust it down or shoot it down. The police entered, told her to put her clothes on, and demanded to know where the dope and money was. According to her, after speaking to her for a

few minutes and repeatedly asking where the dope and money were located, the police tore up the basement and then left. They later returned and arrested Defendant, leaving her at the apartment. She testified that she left out the back door, but could not recall whether the gate had been locked when she went to leave. She testified that she had Defendant's keys, and that she locked the gate when she left.

Defendant also testified in his own behalf. He said he had lived at the Residence for approximately 30 years. When his parents lived there, the basement room had been an entertainment area. Back then, when his parents had friends over, they would come through the front gate.

In 2003 Defendant was living in the basement apartment, and there were tenants in the first- and second-floor apartments. When he had friends over, he said they would knock on the ground-floor windows at the front of the Residence, and then he would come out, unlock the front gate, let them through, and re-lock the gate. Defendant acknowledged that the building tenants had access to both the basement and the backyard. They would come into the basement to use the washroom, which was located between the basement apartment and the basement door leading to the backyard. Both he and the tenants used the dumpster located in the back alley, and they would go through the backyard and the back gate to deposit their trash in the dumpster. He said he always kept both gates locked, and would unlock and relock the back gate when he took out the trash. The tenants were given a key to unlock the front and back gates. Defendant could not say for sure whether the tenants always re-locked the gates, but he said when he went outside, the gates were always locked.

Defendant is 46 years old and admitted to having prior convictions for making a false declaration, resisting arrest, and interfering with officers, and that he was familiar with the criminal justice system. He denied being familiar with guns, ever having possessed a firearm, or having any prior convictions that involved firearms. But Gov't Ex. V, which is a certified document related to Defendant's prior conviction for attempted robbery, first degree, reflects that Defendant used a firearm in connection with the commission of the offense.

Defendant testified that Ms. Hathor had visited him earlier that day, and that he had known her for 3½-4 years. He said the front gate had been locked, and that he had unlocked it for her, re-locked the gate, and then entered with her through the basement door in the backyard. Between the time Ms. Hathor arrived in the morning and when the police arrived, he says he never left the apartment, never went up the back steps, and had no other visitors. He did not know if anyone else went into the backyard, or if anyone else unlocked or opened either of the gates.

He testified Ms. Hathor has used drugs in the past, that he has smoked marijuana with her in the past, and that they might have smoked one marijuana joint the day of the incident. He first realized the police were there when he and Ms. Hathor were lying in bed and she said she heard something going on upstairs. He said he was asleep at the time, and he had not heard anything. He said the police came into the basement apartment, searched it thoroughly, and then left through the basement door. He said they then found a gun, came back, and arrested him. At the hearing, Defendant denied the shotgun was his, denied having seeing the shotgun previously, and said he had not seen it

in the yard earlier in the day when he had let Ms. Hathor in.  He testified that the police advised him that they had seen someone in the backyard and had seen someone run into the house.  Defendant gave conflicting testimony about whether the police asked where the guns and drugs were.  At the hearing, Defendant denied making any statements to the officers other than to inquire why he was being arrested.

Defendant testified Ms. Hathor was present at the time of his arrest and that she was still in the apartment after he left, following his arrest.  Defendant testified that following his arrest, the police took him out the basement door in back, up the gangway, and through the front gate.  Significantly, he testified that when they left, he did not have to unlock the front gate; the gate was unlocked and open.  He did not know how the gate got opened.  Defendant originally testified that he thought the police had left his keys in his apartment when they arrested him, but after review of the booking sheet, which reflects Defendant had his keys with him, he acknowledged that he had his keys with him at the time of his arrest.  See Govt. Ex. U.  Defendant reiterated that he did not need to unlock the gate when he left with the police following his arrest.  Defendant denied ever giving the police permission to enter his backyard on July 11, 2003.

To the extent the testimony is conflicting, the Court, after review of the testimony and evidence, and having carefully observed the manner and demeanor of the witnesses, credits the testimony of Officer Schwerb over that of Defendant and Ms. Hathor.[3]  The

---

[3]  While Mr. and Mrs. Gholston were able to offer testimony regarding the contours of the property owned by them, the purpose for installing the fence, and the manner in which they maintained the gates when they lived there, they were able to offer little relevant testimony regarding the maintenance of the gates after they moved.

Court notes in this regard that Defendant's testimony was at times illogical and internally inconsistent, that the testimony of Defendant and Ms. Hathor conflicted with one another in some respects, and that portions of their testimony was not supported by other evidence. Specifically, the Court finds that at the time the officers arrived at the Residence, both the front and back gates were open and unlocked, and that the officers first entered the Residence through the door to the basement in the backyard, after having seen Defendant discard the firearm. Indeed, even Defendant admitted in his testimony that following his arrest, the front gate to the gangway was already unlocked. Moreover, the Court notes that in his post-hearing memorandum, Defendant accepts the government's version of the facts for purposes of the legal arguments made in his motion.

## CONCLUSIONS OF LAW

**A.  Motion to Suppress Physical Evidence**

1. Entry into the Backyard

Defendant asserts that the officers violated his Fourth Amendment rights by entering the backyard of the apartment building via the gangway. In their post-hearing memoranda, the parties primarily address the issue of whether the gangway and backyard are within the "curtilage." "The Fourth Amendment protects people from unreasonable searches of their home and buildings within the home's curtilage." United States v. Mooring, 137 F.3d 595, 596 (8th Cir. 1998); see United States v. Dunn, 480 U.S. 294, 300-04 (1987). Police, however, may enter a defendant's property to observe buildings

and areas located outside the home's curtilage. United States v. Gerard, 362 F.3d 484, 487 (8th Cir. 2004), cert. denied, 125 S.Ct. 311 (2004); Mooring, 137 F.3d at 596.

It is unnecessary to reach the question of whether the gangway and the backyard are within the curtilage, however, for Defendant's argument fails for two other reasons. First, Defendant has failed to show he had a legitimate expectation of privacy in the backyard. While the government bears the burden to demonstrate an exception to the warrant requirement where police conduct a warrantless search of a residence and areas within the residence's curtilage, the defendant first bears the burden to demonstrate that he had a legitimate expectation of privacy in the area searched. Florida v. Riley, 488 U.S. 445, 455 (1989) (O'Connor, J., concurring); United States v. Mendoza, 281 F.3d 712, 715 (8th Cir. 2002). That burden is met by showing "both a subjective expectation of privacy and that the expectation is objectively reasonable; that is, one that society is willing to accept." Mendoza, 281 F.3d at 715 (quoting United States v. McCaster, 193 F.3d 930, 933 (8th Cir. 1999)); see Katz v. United States, 389 U.S. 347, 361 (1967) (Harlan, J., concurring). Among the factors identified as relevant to this determination are:

> whether the party has a possessory interest in the things seized or the place searched; whether the party can exclude others from that place; whether the party took precautions to maintain the privacy; and whether the party had a key to the premises.

McCaster, 193 F.3d at 933.

The case law recognizes that "tenants of multifamily dwellings have no legitimate expectation of privacy in common or shared areas." Mendoza, 281 F.3d at 715. Thus, in

Mendoza, the Eighth Circuit found that a defendant had no privacy interest in the vestibule of a duplex, where the outer door was not secured, the area contained two mailboxes, and defendant had done nothing to lead the officers to believe he had a protectable interest in the area.  Id.  Accord, McCaster, 193 F.3d 930, 933 (no legitimate expectation of privacy in hallway closet of duplex); United States v. McGrane, 746 F.2d 632, 634 (8th Cir. 1999) (no legitimate expectation of privacy in basement storage locker in multifamily dwelling to which others had access); United States v. Luschen, 614 F.2d 1164, 1173 (8th Cir.) (no reasonable expectation of privacy in second floor landing of apartment building even though it was a "security building" which officer could enter only by getting a key from the manager), cert. denied, 446 U.S. 939 (1980); United States v. Eisler, 567 F.2d 814, 816 (8th Cir. 1977) (no legitimate expectation of privacy in apartment hallway where conversation took place).  This has been found to be so even if officers "trespassed" to gain entry to the area.  United States v. Nohara, 3 F.3d 1239, 1242 (9th Cir. 1993); McGrane, 746 F.2d at 634; Eisler, 567 F.2d at 816.

Here, it is undisputed that the other tenants in the building had equal access to the gangway and to the backyard.  The door on the side of the building that opened onto the gangway provided an entrance for the first- and second-floor tenants, and the tenants and others could enter the gangway through the front or back gates.  The backyard was equally accessible.  The building tenants could access the backyard either through the side door, the basement, or through a separate doorway leading directly to the backyard from the upstairs.  Indeed, the tenants regularly went through the backyard to empty their trash in the dumpster that was in the alley behind the backyard.  Defendant had no right

to exclude the access of the other tenants to the backyard and did not attempt to do so. To the extent the gate leading to the back alley was ever locked, those tenants had keys to the lock.

Moreover, the area was open to full view by those in neighboring apartment buildings and by anyone who was in the public alley. As a factual matter, the Court does not find credible Defendant's testimony that the front and back gates were always or even often kept locked. On the day in question, both gates were unlocked at that time the police arrived. As such, members of the public had ready access to the backyard through either the front or back gates. The CI stated that persons visiting Defendant directly approached the door to Defendant's basement apartment though the backyard, presumably via one of those two gates, and Defendant has accepted the government's facts for purposes of this motion. The individual who fled when the officers arrived likewise left through the backyard and entered the alley through the open rear gate. No signs were posted to alert officers or others to the fact the area was private.

Under these facts, Defendant had no reasonable expectation of privacy in either the gangway area or the backyard. Mendoza, 381 F.3d at 715; United States v. Fields, 113 F.3d 313, 321-22 (2d Cir.) (no search where police entered partially fenced side yard of apartment house and looked through 6" opening into defendant's bedroom, as side yard was common area accessible to other tenants in multi-family apartment building, in which they had no legitimate expectation of privacy), cert. denied, 522 U.S. 976 (1997); United States v. Acevedo, 627 F.2d 68, 69 n.1 (7th Cir.) (no search when officers looked into apartment window from gangway used by public to reach adjoining tavern), cert. denied,

449 U.S. 1021 (1980); <u>see</u> <u>also</u> <u>United States v. Acosta</u>, 965 F.2d 1248, 1256-57 (3d Cir. 1992) (no legitimate expectation of privacy in backyard of apartment building, though landlord permitted defendant/tenant to use, where landlord and his employees freely used area).

Defendant's argument also fails on another ground. Even if one assumes that the gangway and the back door are within the curtilage, "[l]aw enforcement officers may encroach upon the curtilage of a home for the purposes of asking questions of the occupants." <u>United States v. Hammett</u>, 236 F.3d 1054, 1059 (9th Cir.), <u>cert. denied</u>, 534 U.S. 866 (2001). <u>Accord</u>, <u>Rogers v. Pendleton</u>, 249 F.3d 279, 289 (4th Cir. 2001); <u>United States v. Reed</u>, 733 F.2d 492, 501 (8th Cir. 1984). As such, the courts have recognized that officers may enter areas of the curtilage which are impliedly open to use by the public, and in doing so, are free to keep their eyes open and use their senses. Thus, in <u>United States v. Garcia</u>, 997 F.2d 1273, 1279 (9th Cir. 1993), the court stated, "[i]f the front and back of a residence are readily accessible from a public place, like the driveway and parking area here, the Fourth Amendment is not implicated when officers go to the back door reasonably believing it is used as a principal entrance to the building." <u>See also</u> <u>United States v. Raines</u>, 243 F.3d 419, 421 (8th Cir. 2001) ("We have previously recognized that law enforcement officers must sometimes move away from the front door when attempting to contact the occupants of a residence. . . . Thus, [the deputy] did not interfere with [the defendant's] privacy interest when he, in good faith, went unimpeded to the back of [the defendant's] home to contact the occupants of the residence."); <u>Alvarez v. Montgomery County</u>, 147 F.3d 354, 358-59 (4th Cir. 1998)

(where police responding to 911 call regarding underage drinking, and sign at front said "party in back," officers satisfied 4th Amendment's reasonableness requirement by walking to back); cf., Estate of Smith v. Marasco, 318 F.3d 497, 520 (3d Cir. 2003) (officers who have a legitimate purpose in approaching a house may proceed to back of home when they do not get an answer at the front door, when it is the only practical way to attempt to contact the resident, or when they reasonably believe the person they seek may be located elsewhere on the property within the curtilage). Similarly, courts have recognized that the Fourth Amendment is not implicated when such officers use the places visitors would be expected to use, such as walkways and driveways. See United States v. Thomas, 120 F.3d 564, 570 (5th Cir. 1997) (no violation when officers used walkway to front door notwithstanding a privacy fence three feet from the front door, as the gate was open and there was no door bell or knocker at the fence), cert. denied, 522 U.S. 1061 (1998); Reed, 733 at 501 ("[C]ourts have recognized that no Fourth Amendment search occurs where police officers who enter private property restrict their movements to those areas generally made accessible to visitors, such as driveways, walkways, or similar passageways."); accord, United States v. French, 291 F.3d 945, 953 (7th Cir. 2002) (no expectation of privacy in walkway and driveway where no steps taken to prevent public access; "it is not objectionable for an officer to come upon that part of private property opened for public common use and the officer may use the 'route which any visitor to a residence would use . . . for the purpose of making a general inquiry or for some other legitimate reason.'") (citations omitted).

Here, based upon information received from a source who had proved reliable in the past, the officers had a legitimate reason for conducting an investigation. They also had a reasonable basis to believe that members of the public contacted Defendant by proceeding to the backyard and knocking on the back door. When they arrived, they saw nothing to suggest otherwise. The gate to the gangway was open, and there were no signs restricting entrance. The officers entered from a public sidewalk and restricted themselves to the walkway that led to the basement door. As such, the officers were reasonably justified in approaching the back door. United States v. Anderson, 552 F.2d 1296, 1299-1300 (8th Cir. 1977) ("We cannot say that the [federal law enforcement] agent's action in proceeding to the rear after receiving no answer at the front door was so incompatible with the scope of their original purpose that any evidence inadvertently seen by them must be excluded as the fruit of an illegal search."); Reed, 733 F.2d at 501 (officer's initial entry into fenced but open parking lot of commercial property did not invade defendants' reasonable expectation of privacy). See also United States v. Reyes, 283 F.3d 446, 467 (2d Cir. 2002); Hammett, 236 F.3d at 1060 (no 4th Amendment search when officers looked through gap in siding on house while completing a circling of the house looking for another door after no one answered the front door).

Finally, for similar reasons, the Court finds in any event that the gangway and the backyard at this time were not within the curtilage. The "central component" in determining whether a challenged area is within the curtilage is "whether the area harbors the intimate activity associated with the sanctity of a man's home and privacies of life." Dunn, 480 U.S. at 300; Gerard, 362 F.3d at 487. The Supreme Court has developed a

four-factor test to determine curtilage questions: (1) the proximity of the area to the home; (2) whether the area and the house are within the same enclosure; (3) the nature of uses to which the area is put; and (4) the steps taken by the resident to protect the area from being seen by others. Dunn, 480 U.S. at 301; Gerard, 362 F.3d at 487. "'[E]very curtilage determination is distinctive and stands or falls on its own unique set of facts.'" Gerard, 362 F.3d at 487 (quoting Daughenbaugh v. City of Tiffin, 150 F.3d 594, 598 (6th Cir. 1998)). The Eighth Circuit has thus recognized that the four factors referenced above "are analytical tools used in determining whether" the area is so tied to the residence itself "that it should be placed under the [residence's] umbrella of Fourth Amendment protection." Id. at 487.

Applying the above test to the facts of this case, the Court finds that neither the gangway nor the backyard are within the curtilage. The first two factors do weigh in Defendant's favor; the area is immediately adjacent to the home and is surrounded by a fence. But the second factor does not weigh strongly in favor of such a finding, as there were two gates in the fence, both of which opened to public areas, and both gates were open at the time the police arrived. Moreover, the gate was a chain-link fence through which the public could easily see. Under such circumstances, courts have recognized that "the mere existence of such a fence does not necessarily demonstrate enclosure of curtilage." United States v. Soliz, 129 F.3d 499, 502 (9th Cir. 1997), overruled on other grounds, United States v. Johnson, 256 F.3d 895 (9th Cir. 2001).

The third and fourth factors weigh heavily against a finding that the area was within the curtilage. It was a shared area, used regularly by other tenants and available

for use by both the tenants and their guests.  Id. ("We doubt whether, in the absence of evidence of intimate activities, a shared common area in a multi-unit dwelling compound is sufficiently privacy oriented to constitute curtilage."); United States v. Acosta, 965 F.2d 1248, 1257 (3d Cir. 1992) (apartment backyard shared with others not part of curtilage).  Nor were any steps taken to prevent outside observation.  To the contrary, the gangway adjoined and was visible from a public sidewalk in front, and the backyard was wide open to view by surrounding neighbors and members of the public using the public alleyway.  No signs were posted either on the fence or at either of the entrances to keep out the public.  In fact, the Court finds that members of the public, including the individual who fled from the police, used the backyard and gangway to access the basement apartment.

Under these facts, the Court finds that the areas accessed by the police were not the curtilage, and therefore do not fall within the umbrella of the Fourth Amendment. Gerard, 362 F.3d at 487 (garage located close to house and within natural enclosure of trees surrounding both farmhouse and garage not within curtilage, though view of garage obscured by trees, where fenced yard surrounded farmhouse but not garage; driveway led from road directly to garage; there were no signs posted; and the garage was not completely blocked from view by members of the public.); Soliz, 129 F.3d at 502-03 (parking area not curtilage where it was accessible from a driveway gate, off of a public alley, at the back of an apartment complex; the fence was a chain-link fence; one gate providing access from a public street was broken off; and no "No trespassing" signs were posted); Thomas, 120 F.3d at 571 (5th Cir. 1997) (though privacy fence enclosing yard

was three feet from residence, yard was not curtilage because gate was left open and "resident had not taken any steps to indicate that the gate was an entry to a place that permission had to be given to enter."); Acosta, 965 F.2d at 1256-57 (reversing determination that backyard of apartment building was part of curtilage).

For all of these reasons, the Court finds that the police did not violate Defendant's Fourth Amendment rights by walking through the gangway toward the door to the basement apartment. They were therefore entitled to observe what was in plain view from that point. Hammett, 236 F.3d at 1061; United States v. Lloyd, 36 F.3d 761, 763 (8th Cir. 1994).

2. Pursuit into the Basement

The law is clear that officers may not cross the threshold of a residence without either a search warrant or exigent circumstances. United States v. Ball, 90 F.3d 260, 263 (8th Cir. 1996); United States v. Vance, 53 F.3d 220, 221-2 (8th Cir. 1995). "[T]he Fourth Amendment has drawn a firm line at the entrance to the house." Payton v. New York, 445 U.S. 573, 590 (1980). Exigent circumstances have been found where officers are in hot pursuit of a felon, where there is perceived danger to the safety of the officers or the public, where a suspect is likely to escape, undetected, or where evidence is likely to be destroyed. See Warden v. Hayden, 387 U.S. 294, 298-99 (1967); United States v. Wihbey, 75 F.3d 761, 766 (1st Cir. 1996); United States v. Parris, 17 F.3d 227, 229 (8th Cir.), cert. denied, 511 U.S. 1077 (1994). Where entry is made without a warrant, the burden rests with the government to show probable cause and exigent circumstances.

United States v. Walsh, 299 F.3d 729, 732 (8th Cir.), cert. denied, 1223 S.Ct. 617 (2002); Parris, 17 F.3d at 229.

Here the officers had probable cause to arrest Defendant Brooks.  They had received information from a confidential source, who had proven reliable in the past, that Defendant sold guns and drugs from the basement apartment.  When they arrived, an individual who was standing at the basement steps fled.  Officer Schwerb saw a person, later identified as the Defendant, on the steps leading from the basement carrying what appeared to be a concealed rifle, and upon seeing the police, Defendant discarded the item and fled into the basement.  Prior to entering the basement, Officer Schwerb saw that the item discarded was a firearm.

Probable cause is a "fluid concept turning on the assessment of probabilities in a particular factual context--not readily or even usefully reduced to a neat set of legal rules."  Illinois v. Gates, 462 U.S. 213, 232 (1983).  In the context of a warrantless arrest, all that need be shown is a "fair probability" that a crime has been committed and that the defendant committed the crime.  See Gates, supra.  Further, flight when combined with other factors, is a circumstance from which probable cause might be inferred.  See United States v. Clark, 743 F.2d 1255, 1260 (8th Cir. 1984); United States v. Jacquillon, 469 F.2d 380, 385 (5th Cir. 1972).  Under these facts, the officers had probable cause to believe that Defendant had violated the state firearms laws.

United States v. Jones, 204 F.3d 541, 543 (4th Cir. 2000), is similar.  There, police patrolling an area known for high drug traffic saw what looked like a drug transaction between the defendant and another.  Upon seeing the police, the other individual put a

small bag with white powder in his mouth.  The defendant turned and walked away, ignoring the police order to stop.  Upon reaching a residence, he ran up the stairs, entered, and slammed and locked the door.  The Court found probable cause and sufficient exigent circumstances to justify entry into the house to arrest the defendant.  Id. at 543.  See United States v. Willis, 967 F.2d 1220, 1223 (8th Cir. 1992) (police officer who had a reasonable suspicion that "criminal activity might be afoot" had probable cause to arrest defendant who dropped bag and fled); United States v. Clark, 743 F.2d 1255, 1260 (8th Cir. 1984) (officer had probable cause to arrest defendant who suddenly fled when being questioned by postal inspectors about irregularities in incoming mail); United States v. Holloway, 962 F.2d 451, 461 (5th Cir. 1992) (reasonable suspicion before defendant's attempt to flee was elevated to probable cause by defendant's attempt at flight).  See also Illinois v. Wardlow, 528 U.S. 119, 124-125 (2000).

When Defendant fled into the residence with the officers in "hot pursuit," exigent circumstances existed which justified the officers in entering the house to make the arrest. Police officers may arrest persons without a warrant if they have probable cause to believe that the person arrested has committed a crime.  Gerstein v. Pugh, 420 U.S. 103 (1975); Beck v. Ohio, 379 U.S. 89 (1964).  If officers have probable cause to believe that a defendant has committed a crime, they may pursue that person from a public place into a private dwelling to arrest him, as well as conduct a search for weapons, without violating the defendant's Fourth Amendment rights.  See Warden v. Hayden, 387 U.S. 294 (1967).  United States v. Santana, 427 U.S. 38 (1976), is similar to the case now at bar.  The police in Santana observed their informant making a "controlled buy" of heroin

from Santana.  As they observed Santana standing on her porch at her doorway, they pulled their vehicle to the front of her house and announced that they were police officers.  As the officers approached her, she fled into her house with the officers in pursuit, and the officers arrested Santana in her home.  During the arrest, the officers recovered several packets of heroin from the floor of the house and the marked "buy" money from Santana.  In holding the arrest and seizure to be legal, the court stated as follows:

> The only remaining question is whether the act of retreating into her house could thwart an otherwise proper arrest.  We hold that it could not.  In Warden v. Hayden, we recognized the right of police, who had probable cause to believe that an armed robber had entered a house a few minutes before, to make a warrantless entry to arrest the robber and to search for weapons.  This case, involving a true 'hot pursuit,' is clearly governed by Warden.  The need to act quickly here is even greater than in that case, while the intrusion is much less.  The district court was correct in concluding that 'hot pursuit' means some sort of chase, but it need not be an extended hue and cry in and about the public streets.  The fact that the pursuit here ended almost as soon as it began did not render it any the less 'hot pursuit' sufficient to justify the warrantless entry into Santana's house.  Once Santana saw the police, there was likewise a realistic expectation that any delay would result in destruction of evidence . . .
>
> We thus conclude that a suspect may not defeat an arrest which has been set in motion in a public place and is thereby proper under Watson, by the expedient of escaping into a private house.

427 U.S. 38, 42, 43.  See also  Ball, 90 F.3d at 263 (after observing what appeared to be a drug transaction, and the possession of a firearm by the apparent purchaser, exigent circumstances justified pursuit of likely purchaser into residence into which he tried to escape); United States v. Sewell, 942 F.2d 1209, 1211 (7th Cir. 1991) (after undercover officers made a purchase of narcotics in the doorway of the defendant's house, and

attempted to arrest him, exigent circumstances justified pursuit of defendant when he retreated into his home and subsequent arrest of his wife in another room).  Further, as in Santana, the intrusion was relatively minor, and the exigent circumstances were more potentially dangerous than in Santana.

Moreover, the officers were reasonable in not waiting for a search warrant, as such action might have compromised their own safety or the safety of others. Ball, 90 F.3d at 263; Vance, 53 F.3d at 222.  In addition, Defendant might easily have destroyed evidence, including any money or drugs.  United States v. Esparza, 162 F.3d 978, 980 (8th Cir. 1998); Ball, 90 F.3d at 263 ("It would be reasonable for such an officer to conclude that the escaping suspect might try to destroy or remove evidence in the house.").  See also United States v. Pennington, 287 F.3d 739, 747 (8th Cir. 2002); United States v. Pierson, 219 F.3d 803, 805-6 (8th Cir. 2000).  Thus, numerous exigent circumstances justified the entry.

3.  Retrieval of the Firearm

It is unclear whether Defendant is challenging the seizure of the firearm on independent grounds.  In his statements to the officers at the time of his arrest, Defendant apparently denied any ownership of the firearm, and at the hearing Defendant denied any knowledge whatsoever of its existence.  As such, there is some question whether Defendant has standing to challenge the seizure of the firearm.  In any event, however, the seizure was justified under several theories.

First, the rifle was properly seized as contraband in plain view. As set forth above, the rifle seized was clearly in plain view of the officers while they were lawfully in the

backyard of the building. The plain view doctrine permits law enforcement officers to ''seize evidence without a warrant when (1) 'the officer did not violate the Fourth Amendment in arriving at the place from which the evidence could be plainly viewed,' (2) the object's incriminating character is immediately apparent, and (3) the officer has 'a lawful right of access to the object itself.'" United States v. Weinbender, 109 F.3d 1327, 1330 (8th Cir. 1997) (quoting United States v. Hughes, 940 F.2d 1125, 1126-27 (8th Cir. 1991), in turn quoting Horton v. California, 496 U.S. 128, 136-37 (1990)). A seizure of items seen while officers are on the premises following a hot pursuit satisfies the first prong of the test. See Coolidge v. New Hampshire, 403 U.S. 443, 465 (1971). See also United States v. Boyd, 180 F.3d 967, 975 (8th Cir. 1999) (plain view seizure during protective sweep).

The incriminating nature of an item is "immediately apparent," within the meaning of the second prong of the test, when officers have "probable cause to associate the property with criminal activity." United States v. Hatten, 68 F.3d 257, 261 (8th Cir. 1995), cert. denied, 516 U.S. 1150 (1996) (quoting United States v. Garner, 907 F.2d 60, 62 (8th Cir.), cert. denied, 498 U.S. 1068 (1991)). To meet this standard, it is not necessary that the officers be certain that the item is associated with criminal activity. It is sufficient if, based on the facts available, a reasonably cautious person might believe that the items may be contraband, stolen property, or useful as evidence of a crime. Weinbender, 109 F.3d at 1330; Garner, 907 F.2d at 62. Defendant's possession of a shotgun concealed in plastic bags was, itself, a crime, and the firearm was clearly evidence of that crime. United States v. Patterson, 140 F.3d 767, 773 (8th Cir. 1998)

(concealed firearm provides probable cause for arrest for violation of Mo. Rev. Stat. § 570.030).

Second, the firearm was also subject to seizure as a reasonable safety precaution. See Coolidge v. New Hampshire, supra; United States v. Pillow, 842 F.2d 1001, 1004 (8th Cir. 1988); United States v. Queen, 847 F.2d 346, 353-54 (7th Cir. 1988)("This is hardly a situation where law enforcement officers have reduced property not immediately associated with the person of the arrestee to their exclusive control, and there is no longer any danger that the arrestee might gain access to the property to seize a weapon or destroy evidence.").

Finally, the firearm was abandoned by Defendant. The warrantless seizure of abandoned property is not unreasonable and does not violate the Fourth Amendment. Abel v. United States, 362 U.S. 217, 241 (1960); United States v. Segars, 31 F.3d 655, 658 (8th Cir. 1994) (defendant dropped package and fled), cert. denied, 513 U.S. 1099 (1995). While the abandonment cannot be the product of unlawful police conduct, "[t]he existence of a police pursuit or investigation at the time of abandonment does not of itself render the abandonment involuntary." Segars, 31 F.3d at 658 (quoting United States v. Jones, 707 F.2d 1169, 1172 (10th Cir. 1983)). See Hodari D., 499 U.S. at 626 (defendant fled on approach of police and threw down drugs while fleeing); United States v. Liu, 180 F.3d 957, 960-962 (8th Cir. 1999) (defendant left train after police questioning, leaving behind luggage); United States v. Willis, 967 F.2d 1220, 1223 (8th Cir. 1992) (defendant abandoned shopping bag by dropping it in parking lot, with police in pursuit).

### B.  Motion to Suppress Statements

Defendant denies making any oral statements to the officers at the time of his arrest.  To the extent any such statements were made, however, Defendant asserts that they were the result of the officers' unlawful search and seizure and were made in violation of his rights under Miranda.

A defendant may knowingly and intelligently waive his rights and agree to answer questions.  Miranda v. Arizona, 384 U.S. 436, 479 (1966).  When the prosecution seeks to introduce in evidence a statement made by a defendant while in custody, it has the burden of showing by a preponderance of the evidence that the statement was made after a voluntary, knowing, and intelligent waiver of Miranda rights by the defendant. Colorado v. Connally, 479 U.S. 157 (1986).  The court must examine the totality of the circumstances surrounding the interrogation to determine whether the waiver was the product of a free and deliberate choice, rather than intimidation, coercion, or deception, and whether the waiver was made with an awareness of the right being abandoned and the consequences of the decision to abandon it.  Moran v. Turbine, 475 U.S. 412 (1986). The statement must be voluntary and not the product of any police conduct by which the defendant's will is overborne.  Colorado v. Connally, 479 U.S. at 170;  Haynes v. Washington, 373 U.S. 503 (1963).  "The requirement that Miranda warnings be given does not, of course, dispense with the voluntariness inquiry."  Dickerson v. United States, 530 U.S. 428, 444 (2000).  As the Supreme Court has recognized, however, "[c]ases in which a defendant can make a colorable argument that a self-incriminating statement was 'compelled' despite the fact that law enforcement authorities adhered to the dictates of

Miranda, are rare."  Berkemer v. McCarty, 468 U.S. 420, 433 n.20 (1984).  See

Dickerson, 530 U.S. at 444.

Prior to making his oral statements, the defendant was advised orally of his

Miranda rights.  The defendant is an adult, and he appeared to be in a normal mental state

and did not appear to be intoxicated or under the influence of narcotics.  Although he was

under arrest at the time he made any statements, there is no evidence of any threats,

promises, or intimidation.  Moreover, defendant had several prior criminal convictions

and was therefore familiar with the criminal justice system.  See United States v.

Glauning, 211 F.3d 1085, 1087 (8th Cir. 2000) (defendant's age and experience with

criminal justice system evidence relevant to finding statement was voluntary).

In addition, it appears that some or all of Defendant's statements were made

immediately after his arrest and advice of rights, and prior to any questioning.  Any such

statements were voluntary and not the result of any interrogation.  Rhode Island v. Innis,

466 U.S. 291, 300-01 (1980); Butzin v. Wood, 886 F.2d 1016, 1018 (8th Cir. 1989), cert.

denied, 496 U.S. 909 (1990); United States v. Webster, 796 F.2d 487, 491-92 (8th Cir.

1985) (statements volunteered by suspect during routine arrest procedures not the product

of interrogation).

Based on these facts, the Court finds that Defendant's oral statements were

voluntary and should not be suppressed.

Accordingly,

**IT IS HEREBY RECOMMENDED** that Defendant's Motion to Suppress Evidence and Statements (Doc. Nos. 19 & 20) be **denied.**

Trial in this matter has been set for **Monday, April 11, 2005, at 9:00 a.m.**, before the **Honorable Jean C. Hamilton**.

The parties are advised that they have eleven (11) days in which to file written objections to this report and recommendation pursuant to 28 U.S.C. §636(b)(1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact.  See Thompson v. Nix, 897 F.2d 356 (8th Cir.1990).

_____
AUDREY G. FLEISSIG
United States Magistrate Judge

Dated this 9th day of March, 2005.